UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARTHA BERNDT, et al.,

    Plaintiffs,

    v.

CALIFORNIA DEPARTMENT OF CORRECTIONS, et al.,

    Defendants.

_____/

No. C 03-3174 PJH

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF BERNDT**

Defendants' motion for summary judgment as to the claims of plaintiff Martha Berndt came on for hearing before this court on August 6, 2014. Plaintiff appeared through her counsel, Pamela Price. Defendants California Department of Corrections ("CDCR"), Joseph McGrath, Teresa Reagle[1], and David Skerik (together, "defendants") appeared through their counsel, Lyn Harlan and Chris Young. Having read the papers filed in conjunction with the motion and carefully considered the arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS in part and DENIES in part defendants' motion for summary judgment as follows.

**BACKGROUND**

This case arises out of allegations that female correctional officers and employees of CDCR have been continuously sexually harassed by inmates at CDCR institutions. Plaintiffs claim that they have been exposed to repeated inmate exhibitionist masturbation

---

[1] Defendant Reagle (formerly Teresa Schwartz) was named in the complaint as Teresa Schwartz, but will be referred to as Teresa Reagle in this order.

(referred to as "IEX") while working at CDCR institutions.

Specifically, the operative fifth amended complaint ("5AC") makes the following allegations with regard to plaintiff Berndt.

Plaintiff alleges that she began her employment as a correctional officer at Centinela State Prison in July 1994, and then worked at Pelican Bay State Prison from May 1995 to July 2002. Berndt alleges that, on July 12, 2002, she was ordered by a supervisor (Sergeant David Skerik) to place inmate Goldwire Jackson in a cell, in full view of the control booth. 5AC, ¶ 24. Inmate Jackson is described in the 5AC as a "notoriously abusive exhibitionist masturbator." Id. Berndt claims that she made "strenuous objections" to this order, and gave an "explicit warning that the inmate would create an extremely hostile and dangerous environment if placed in front of the control booth." Id. Regardless, Skerik insisted that the inmate be placed there. Berndt then alleges that, from August 2001 through July 12, 2002, "inmate Jackson repeatedly sexually harassed" her "with taunts and threats." Id.

The complaint itself does not contain any additional factual allegations regarding Berndt; however, more factual allegations are contained in Berndt's opposition to defendants' motion (Dkt. 673), as well as Berndt's declaration filed in support of her opposition (Dkt. 674). Berndt alleges that she was subjected to IEX by at least 15 different inmates during her time at Pelican Bay. Dkt. 674, ¶ 5. Berndt provides more specific allegations regarding inmate Goldwire Jackson. Berndt alleges that, "on December 2, 2001, inmate Goldwire Jackson [] first began his sexual misconduct towards" her. Id., ¶ 6. Berndt alleges that, on that date, Jackson "continually exposed his erect penis while using his hair clippers," and then "turned his body sideways" so "no other officers could see him and masturbated, intentionally facing [her] direction so that [she] could see him masturbate." Id. Berndt alleges that she told Jackson "three times very clearly that his exhibitionist masturbation was not appreciated." Later, after two other officers left the cell, Jackson "openly masturbated" in front of Berndt and then "hid his penis when the two male officers returned." Id., ¶ 7. When one of the male officers returned, Jackson pulled up his

pants, and the officer asked Berndt if she needed assistance." Berndt said yes, "because when he left, Jackson would again expose himself." Id. Berndt then filed a report (specifically, a "115 report") and informed a supervisor (Sergeant Van Nocker).

Berndt then alleges that, on January 12, 2002, she was assigned to a control booth observing inmate Charles Jackson[2]. Dkt. 674, ¶ 9. Berndt alleges that inmate C. Jackson "would turn his cell lights off and on just to get [her] attention," and that "each time [she] looked up, he would be in front of the cell door without pants displaying his genitals to [her] along with making masturbation motions." Id. Berndt alleges that she ultimately filed a 115 report against him, and reported his behavior to Sergeant Willis that same day. Id., ¶ 10.

Berndt then alleges that, on June 2, 2002, she witnessed inmate Goldwire Jackson "masturbating to the yard camera as he noticed that [Berndt] was the one monitoring the yard camera." Dkt. 674, ¶ 11. Berndt notified a supervisor (Sergeant Willis).

Berndt then alleges that, on July 12, 2002, she was assigned to a control booth, and inmate Jackson was placed in a holding cell eight feet from the booth. Dkt. 674, ¶ 12. Inmate Jackson "immediately dropped his boxers when he saw that the floor staff was no longer in view, and began masturbating." Id. Berndt notified a supervisor (Lieutenant Christ) about the incident, and inmate Jackson "started shouting" at Berndt, saying things like "Shut up, bitch!  You know you like it!" and "You ain't nothing but a whore!" Id., ¶ 13. At the end of that day, Berndt was told by a supervisor (Captain Scribner) that inmate Jackson was going to be moved that night, but when Berndt returned to work the next morning, Jackson had not been moved. Id., ¶¶ 14-15. Later that morning, Jackson complained of chest pains, and Berndt was assigned to move him so that he could be examined. Berndt alleges that, as he was being moved, Jackson gave her an "I got you" look, and that the "tone of his voice, his face, gesture, and laugh taunted" her. Id., ¶ 15. After the medical exam, Berndt "refused to open the gate" for Jackson, even after being

---

[2] The bulk of Berndt's allegations relate to inmate Goldwire Jackson, who will be referred to as "inmate Jackson" or "Jackson." Inmate Charles Jackson will be referred to either by his full name or by "C. Jackson."

3

given a direct order by a supervisor (Sergeant Willis). Berndt was then relieved of duty, and was told by Lieutenant Christ that she could not be put back in her same job position because she was "in no state of mind to continue." Id., ¶¶ 16. Berndt never did return to work, and formally retired in October 2003. Id., ¶ 17.

Berndt alleges that, prior to July 13, 2002, she "orally asked Sergeant Willis four or five times to remove inmate Jackson from [her] shifts, and every time, Sergeant Willis refused to move inmate Jackson from the unit and would send [Berndt] home instead." Dkt. 674, ¶ 18. Berndt alleges that she filed at least four 115 reports on inmate Jackson, but no action was ever taken. Berndt further alleges that, on July 12, 2002, she spoke to defendant Skerik, but he "avoided responding" to her and "insisted on placing inmate Jackson in the holding cell eight feet away from" Berndt, reasoning that "if [they] gave inmate Jackson an opportunity to 'mess up,' it would give CDC reason to place him on more restrictions." Id.

Berndt further alleges that defendant Skerik was her supervisor prior to July 12, 2002, and that she had "complained to him on prior occasions about exhibitionist masturbation by inmate Jackson and others." Dkt. 674, ¶ 19. Berndt alleges that Skerik's actions on July 12, 2002 "were not the only actions he took that contributed to the hostile work environment," and that he "had turned a blind eye and ear to [her] pleas long before July 12th." Id. Berndt further alleges that, on July 12, 2002, Skerik "knew that the officers he assigned to watch inmate Jackson could be called away from that assignment at any time." Id.

In the 5AC, Berndt asserts two causes of action: (1) sex discrimination under Title VII against defendant CDCR, and (2) violation of section 1983 (equal protection) against defendants McGrath (Chief Deputy Warden and then Warden at Pelican Bay), Reagle (Associate Warden and then Chief Deputy Warden at Pelican Bay), and Skerik (Correctional Sergeant at Pelican Bay).

4

**DISCUSSION**

A.  Legal Standard

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105-06 (9th Cir. 2000); see also Celotex, 477 U.S. at 324-25 (moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed. R. Civ. P. 56(c), (e). But allegedly disputed facts must be material – the existence of only "some alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment." Anderson, 477 U.S. at 247-48.

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

B.  Legal Analysis

   1.  Title VII claim

To establish a claim for hostile work environment (or harassment) under Title VII, a plaintiff must show (1) that she was subject to unwelcome verbal, physical, or visual conduct, (2) that the conduct was based on gender, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment from the perspective of a reasonable person. See, e.g., Little v. Windermere Relocation, Inc., 301 F.3d 958, 966 (9th Cir. 2001). However, even if a plaintiff can show the existence of a hostile work environment to which she was subjected, the plaintiff must also establish that the employer is liable for the harassment that caused the hostile work environment to exist. Id.

In Freitag v. Ayers, the Ninth Circuit held that CDCR can be liable for inmate conduct if it "either ratifies or acquiesces in the harassment by not taking immediate and/or corrective action when it knew or should have known of the conduct." 468 F.3d 528, 538 (9th Cir. 2006). The court explained that liability is "grounded not in the harassing act itself – i.e., inmate misconduct – but rather in the employer's 'negligence and ratification' of the harassment through its failure to take appropriate and reasonable responsive action." Id.

In other words, for CDCR to be liable under Title VII, a plaintiff must show (1) that she was subjected to a sexually hostile work environment because of inmate conduct, (2) that CDCR knew or should have known that plaintiff was being subjected to such inmate conduct, and (3) CDCR failed to respond appropriately and reasonably to the inmate conduct. Element (3) has been phrased in a number of different ways – sometimes as requiring an "immediate and appropriate" response, sometimes as requiring "immediate and/or corrective actions," and sometimes as requiring "corrective measures reasonably

6

calculated to end the harassment," with reasonableness being measured by "the employer's ability to stop the harassment and the promptness of the response." See, e.g., Freitag, 468 F.3d at 538-40; Little, 301 F.3d at 968. Regardless of the specific phrasing used, it is clear that element (3) requires a showing that the employer acted unreasonably in its response to the harassment.

CDCR does not appear to dispute that plaintiff was subjected to unwelcome verbal, physical, or visual conduct, or that the conduct was based on gender, and instead limits its disputes to whether the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment from the perspective of a reasonable person, and to whether CDCR bears any liability for any alleged inmate harassment.

As a threshold matter, CDCR argues that two of the alleged IEX incidents are time-barred, as they occurred more than 300 days before plaintiff administratively exhausted her claims. However, the court finds that plaintiff has convincingly argued that the "continuing violation" doctrine applies in this case, which allows the inclusion of otherwise time-barred incidents as long as they are deemed part of "one unlawful employment practice giving rise to a single claim." See, e.g., National Railroad Passenger Corporation v. Morgan, 536 U.S. 101, 118 (2002). Thus, the court will consider all four IEX incidents alleged by plaintiff to be part of her Title VII claim.

CDCR then appears to argue that four IEX incidents are not sufficiently "severe or pervasive" to give rise to a Title VII claim, pointing out that the IEX in Freitag "was deemed severe and pervasive when it occurred multiple times over a period of almost a year," and arguing that Berndt's circumstances are "not similar." However, the court notes that, in Freitag, the Ninth Circuit concluded that three IEX incidents were sufficient to constitute a hostile work environment (even though it ultimately found that the actual number of IEX incidents was five), and further held that even "a single incident of severe abuse can constitute a hostile work environment." Freitag, 468 F.3d at 540. Thus, the court finds that plaintiff has raised a triable issue of fact as to whether she was subjected to a hostile work

environment based on gender.

As to the issue of defendant's liability, CDCR argues that it took a number of measures to address the issue of IEX at Pelican Bay, including the treatment of IEX incidents as "Serious Rule Violations," the encouragement of referrals to the district attorney's office for prosecution of chronic IEX offenders, the requirement that all IEX incidents be reported, and the issuance of various memos making clear that "IEX directed at staff would 'not be tolerated' and would be a disciplinary offense." See Dkt. 665-1 at 2-4. With regard to Berndt specifically, CDCR argues that it "took [her] reports seriously and responded by imposing the maximum discipline allowed under Title 15."

However, despite CDCR's arguments, given plaintiff's assertions – including that defendant failed to move inmate Jackson – the court finds that there remains a triable issue of fact as to whether CDCR acted reasonably in response to any reports of harassment made by Berndt. Accordingly, the court DENIES defendants' motion for summary judgment as to the Title VII claim asserted by plaintiff Berndt.

2.  Section 1983 claim

To establish a claim under section 1983, plaintiff must show (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under the color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988); Ketchum v. Alameda County, 811 F.2d 1243, 1245 (9th Cir. 1987). Element (2) is undisputed, as all three defendants were employees of the state and acting in their official capacities. As to element (1), plaintiff contends that the relevant "right secured by the Constitution or laws of the United States" is the right of a woman to be free from sexual harassment in her workplace. See, e.g., Bator v. State of Hawaii, 39 F.3d 1021, 1028 (9th Cir. 1994) ("severe or pervasive physical and verbal harassment can be impermissible sex discrimination under the Equal Protection Clause," and "it was clearly established by 1988 that . . . adverse alteration of job responsibilities, and other hostile treatment were impermissible sex discrimination in violation of the Equal Protection Clause.").

The court agrees that state employees have a constitutional right to be free of sexual harassment. However, the Bator court made clear that "the Equal Protection Clause proscribes purposeful discrimination by state actors, in the workplace and elsewhere, based solely on an individual's membership in a protected class." 39 F.3d at 1027 (emphasis added). The Bator court dealt with harassment claims being brought under two theories – Title VII and equal protection. In a footnote, it noted that both legal theories "address the same wrong: discrimination," but explained that the two claims "differ" because "a plaintiff must show intentional discrimination and state action for equal protection claims (but not for Title VII claims)." Id. at 1028, fn. 7.

The Bator court's "intentional discrimination" requirement for an equal protection claim operates in addition to the "personal participation" requirement applicable to all section 1983 claims. See, e.g., Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant."). Under Ninth Circuit precedent, "[a] person deprives another of a constitutional right, where that person 'does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [that person] is legally required to do that causes the deprivation of which complaint is made.'" See, e.g., Hydrick v. Hunter, 500 F.3d 978, 988 (9th Cir. 2007) (citing Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)). The Hydrick and Johnson courts went on to hold that the "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." Hydrick, 500 F.3d at 988 (citing Johnson, 588 F.2d at 743). Thus, in order to establish that defendants violated plaintiff's right to equal protection by subjecting her to sexual harassment, plaintiff must first establish the elements of a sexual harassment claim, and then must show that defendants either personally participated in the sexual harassment, or set in motion a series of acts by others which defendants knew or reasonably should have known would cause sexual harassment, and that defendants acted with the intent to discriminate against plaintiff.

As explained above, to establish a claim for sexual harassment (or hostile work environment), a plaintiff must show (1) that she was subject to unwelcome verbal, physical, or visual conduct, (2) that the conduct was based on gender, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment from the perspective of a reasonable person. See, e.g., Little, 301 F.3d at 966.

The court has already found that plaintiff has raised a triable issue of fact as to whether she was subjected to a hostile work environment based on gender. Thus, the next issue for the court to determine is whether plaintiff has sufficiently shown that defendants McGrath, Reagle, and/or Skerik personally participated in any constitutional violation, and whether they acted with the intent to discriminate.

As to defendant McGrath, plaintiff alleges in the complaint that he "willfully subjected" her "to a sexually hostile work environment by refusing to address exhibitionist masturbation at Pelican Bay where he knew that inmates targeted female employees for sexual harassment." 5AC, ¶ 76. The 5AC further alleges that McGrath "had the authority and responsibility to address the overwhelming problem of exhibitionist masturbation," and that "[n]otwithstanding his knowledge of the sexually hostile work environment, [he] refused to implement any of the recommendations proposed by the [OIG] in July 2000." Id. Finally, the 5AC alleges that McGrath "actively tried to minimize and conceal the impact of exhibitionist masturbation on female employees" and "deliberately and intentionally tried to make it appear as if plaintiffs were exaggerating and fabricating reports of inmate exhibitionist masturbation." Id., ¶ 77.

However, Berndt's opposition brief does not identify any evidence that would support the 5AC's allegations against McGrath. Berndt first argues that McGrath is "collaterally estopped from claiming that [he] took prompt effective action in response" to IEX, based on the Freitag decision. However, McGrath was not a defendant in Freitag, and plaintiff does not provide any basis for asserting collateral estoppel against him.

Plaintiff then asserts, in her opposition brief, that "the evidence in this case is that

10

both defendants [Reagle] and McGrath retaliated against female employees who complained about the problem." Dkt. 673 at 18. However, the only specific examples of retaliation alleged are against Officer Freitag and Judy Longo (another plaintiff in this action), Berndt does not allege that McGrath retaliated against her.

Berndt then alleges that McGrath "disputed the OIG report and refused to implement its recommendations." As support for that assertion, Berndt cites to three passages in McGrath's deposition testimony. See Dkt. 691[3], Ex. A. A look at the cited passages show that plaintiff is mischaracterizing McGrath's testimony, as McGrath stated only that certain recommendations were not necessary because they were already in effect. See Dkt. 691, Ex. A at 125:12-22 (acknowledging OIG recommendation that Pelican Bay "create a comprehensive system for tracking rule violation reports" and responding that Pelican Bay "already ha[d] that in effect."); 126:5-14 (acknowledging OIG finding that there was no process to monitor the 30-day limit for disciplinary hearings to take place, but stating that it was "inaccurate" as "there was something within the tracking process to monitor the 30-day time limit"); 146:13-148:5 (acknowledging recommendation to develop guidelines for referring IEX cases to district attorney's office, and responding that "we have always had this," and that he did not recall having any guideline preventing referral of prisoners serving life sentences without parole.).

Berndt then alleges that McGrath acted improperly in failing to discipline a "Lt. Carmichael" (who made inappropriate comments to a female correctional officer regarding IEX). However, plaintiff has still failed to tie these alleged actions to any constitutional deprivation that she herself suffered.

The closest that plaintiff comes to establishing McGrath's personal participation is by citing a statement made by McGrath to Berndt's husband (Alan Berndt), saying that "there

---

[3] Plaintiff's counsel appears to have cited to a declaration filed along with a different plaintiff's opposition brief, rather than to her declaration filed with plaintiff Berndt's opposition brief. The court will consider the declaration filed with plaintiff Kimberly Morin's opposition (Dkt. 691), because the declaration filed with plaintiff Berndt's opposition (Dkt. 677) does not include all of the McGrath deposition excerpts cited by plaintiff Berndt in her opposition brief.

11

was poor decision after poor decision after poor decision made." Dkt. 675 at 2. Defendants object to this evidence as hearsay, but even if the statement is considered, it does not establish McGrath's personal involvement in any alleged violation, it merely shows an after-the-fact awareness that mistakes were made by some unspecified individuals.

Overall, it appears that Berndt's theory of liability as to McGrath is based solely on McGrath's status as Chief Deputy Warden and then Warden of Pelican Bay. Berndt thus seeks to impute any wrongdoing that occurred at Pelican Bay to McGrath, even in the absence of any showing that McGrath took part in the alleged wrongdoing. While Berndt has shown that McGrath was aware of the problem of IEX generally (based on the Freitag litigation and the OIG report), Berndt has not shown that he was aware of and failed to prevent the specific harassment to which Berndt was subjected. Berndt provides no evidence showing that she made complaints to McGrath, or that McGrath was made aware of the complaints that she made to her direct supervisors. Overall, to allow Berndt to withstand summary judgment on her equal protection claim against McGrath would essentially allow respondeat superior liability under section 1983, as it would hold McGrath responsible for the conduct of his subordinates without any showing of personal involvement. Accordingly, the court GRANTS defendants' motion for summary judgment as to the section 1983 claim against McGrath.

As to defendant Reagle, plaintiff alleges in the complaint that Reagle (referred to as Schwartz) "intentionally, willfully, and without justification, allowed [Berndt] to be exposed to habitual exhibitionist masturbation," as she "knew that inmates engaged in exhibitionist masturbation, creating a sexually hostile environment." 5AC, ¶ 74. The 5AC further alleges that Reagle "intentionally protected inmate Jackson by altering and minimizing disciplinary reports filed against him for exhibitionist masturbation," and "allowed him to subject female officers to exhibitionist masturbation without any consequences for his actions." Id. Finally, the 5AC alleges that Reagle "deliberately refused" to address the IEX problem, "turning a blind eye to the complaints and concerns" of CDCR employees. Id., ¶ 75.

12

However, as with her allegations against McGrath, Berndt's opposition brief fails to provide support for the complaint's allegations against Reagle. Plaintiff first argues that Reagle, like McGrath, is collaterally estopped from claiming that she took prompt, effective remedial action in response to IEX, based on the Freitag verdict. However, Reagle in Freitag, Reagle's only basis of liability was for retaliation against Deanna Freitag in violation of her First Amendment rights, not for denial of equal protection under the Fourteenth Amendment. Thus, plaintiff cannot avoid summary judgment as to Reagle simply by pointing to the Freitag decision.

The only specific conduct of Reagle's that is mentioned in the opposition is the "initiat[ion] of multiple adverse actions against Officer Freitag after she complained" about IEX, and the reduction in severity of an IEX offense by Jackson that was reported by Freitag. Dkt. 673 at 18. Berndt does not allege that Reagle was involved in any specific deprivation of her rights, nor does she allege that Reagle was aware of Berndt's complaints and failed to adequately respond to them. As with McGrath, Berndt is attempting to impute any wrongdoing that occurred at Pelican Bay to Reagle simply by virtue of her position as Associate Warden or Chief Deputy Warden. Thus, for the same reasons as above (with respect to McGrath), the court GRANTS defendants' motion for summary judgment as to the section 1983 claim asserted against Reagle.

Finally, as to defendant Skerik, plaintiff alleges in the complaint that Skerik "deliberately and continually forced Berndt to supervise inmates who chronically engaged in exhibitionist masturbation" and "refused to relieve Berndt from duty when she became extremely distressed by the inmates' behavior." 5AC, ¶ 78. Specifically, the complaint that, on July 12, 2002, she was ordered by Skerik to place inmate Jackson in a cell, in full view of the control booth in which plaintiff was working. Id., ¶ 24. Berndt claims that she made "strenuous objections" to this order, and gave an "explicit warning that the inmate would create an extremely hostile and dangerous environment if placed in front of the control booth." Id. Regardless, Skerik insisted that the inmate be placed there.

Plaintiff's opposition brief provides more details regarding the July 12, 2002 incident.

Plaintiff explains that Skerik was her supervisor prior to July 12, 2002, and that she had "complained to him on prior occasions about exhibitionist masturbation by inmate Jackson and others." Dkt. 674, ¶ 18. Plaintiff then alleges that she spoke to Skerik on July 12, 2002,[4] but that he "avoided responding" to what she told him, and "insisted on placing inmate Jackson in the holding cell eight (8) feet" from her work station. Id. Plaintiff alleges that she "strenuously objected" to Skerik's order, but he responded by stating that he was giving inmate Jackson "an opportunity to mess up," which would justify further restrictions. Id.

While defendants dispute plaintiff's allegations, and argue that Skerik was not motivated by discriminatory animus, the court finds that plaintiff has raised a triable issue of fact as to whether Skerik violated section 1983 by failing to respond to her complaints of harassment, and as to whether Skerik acted with the intent to discriminate based on gender. However, before ruling on defendants' motion as to Skerik, the court must first address defendants' qualified immunity argument.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The rule of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law"; defendants can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. Malley v. Briggs, 475 U.S. 335, 342 (1986). "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the

---

[4] Plaintiff's declaration leaves some confusion as to whether she spoke to Skerik before or after the July 12, 2002 IEX incident involving inmate Jackson. Plaintiff alleges that she spoke to Skerik "on July 12, 2002, regarding the incident that day, but he avoided responding to what [she] told him, and insisted on placing inmate Jackson in the holding cell eight (8) feet from [her] work station." Dkt. 674, ¶ 18. However, even if plaintiff's July 12 complaint occurred after the IEX incident, she does allege that she complained to Skerik about inmate Jackson's harassment before July 12, so the evidence still supports plaintiff's allegations that Skerik chose to place inmate Jackson in a position where he could harass her despite being aware of her complaints about Jackson's harassment.

right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir. 1991). Qualified immunity is particularly amenable to summary judgment adjudication. Martin v. City of Oceanside, 360 F.3d 1078, 1081 (9th Cir. 2004).

A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. See Pearson v. Callahan, 555 U.S. 225, 235-36 (2009) (overruling the sequence of the two-part test that required determination of a deprivation first and then whether such right was clearly established, as required by Saucier v. Katz, 533 U.S. 194 (2001)). The court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. Id. (noting that while the Saucier sequence is often appropriate and beneficial, it is no longer mandatory).

Regarding the first prong, the threshold question must be: Taken in the light most favorable to the party asserting the injury, do the facts alleged show that the defendant's conduct violated a constitutional right? Saucier, 533 U.S. at 201; see Martin, 360 F.3d at 1082 (in performing the initial inquiry, court is obligated to accept plaintiff's facts as alleged, but not necessarily his application of law to the facts; the issue is not whether a claim is stated for a violation of plaintiff's constitutional rights, but rather whether the defendants actually violated a constitutional right) (emphasis in original). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.

The inquiry of whether a constitutional right was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition. Saucier, 533 U.S. at 202. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable defendant that his conduct was unlawful in the situation he confronted. Id.; *see, e.g.*, Pearson, 555 U.S. at 243-44

15

(concluding that officers were entitled to qualified immunity because their conduct was not clearly established as unconstitutional as the "consent-once-removed" doctrine, upon which the officers relied, had been generally accepted by the lower courts even though not yet ruled upon by their own federal circuit). If the law did not put the defendant on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. Saucier, 533 U.S. at 202.

"If there are genuine issues of material fact in issue relating to the historical facts of what the official knew or what he did, it is clear that these are questions of fact for the jury to determine." Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1099 (9th Cir. 1995). If the essential facts are undisputed, or no reasonable juror could find otherwise, however, then the question of qualified immunity is appropriately one for the court. Id. at 1100 (citing Hunter v. Bryant, 502 U.S. 224, 227-28 (1991)). Or the court may grant qualified immunity by viewing all of the facts most favorably to plaintiff and then finding that under those facts the defendants could reasonably believe they were not violating the law. See, e.g., Marquez v. Gutierrez, 322 F.3d 689, 692-93 (9th Cir. 2003); Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1051-53 (9th Cir. 2002).

Because the court has already granted the motion for summary judgment as to McGrath and Reagle, the court does not reach their qualified immunity arguments. As to Skerik, the court finds that the qualified immunity defense must be rejected under either prong. On the first prong, the court finds that, taken in the light most favorable to the party asserting the injury, plaintiff has alleged a violation of an actual constitutional right. And as to the second prong, as stated above, the court finds that there are genuine issues of material fact as to whether Skerik violated section 1983 by failing to respond to Berndt's complaints with the intent to discriminate based on gender. If Skerik acted with the intent to discriminate, he could not reasonably have believed that his conduct was lawful. Accordingly, as to Skerik, defendants' motion for summary judgment on plaintiff's section 1983 claim is DENIED.

## CONCLUSION

For the reasons stated above, defendants' motion is DENIED as to the Title VII claim asserted against CDCR, GRANTED as to the section 1983 claims asserted against McGrath and Reagle, and DENIED as to the section 1983 claim asserted against Skerik.

**IT IS SO ORDERED.**

Dated: September 16, 2014

PHYLLIS J. HAMILTON
United States District Judge