UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| MARTHA BERNDT, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS, et al.,<br><br>    Defendants. | Case No. 1:03-cv-03174-NJV<br><br>**ORDER DENYING MOTION FOR NEW TRIAL**<br><br>Re: Dkt. No. 907 |

This case was tried on February 1, 2016, through February 10, 2016, at which time the jury returned a verdict for Defendants. The jury found that Plaintiff Martha Berndt, who had worked as a correctional officer in the Secured Housing Unit ("SHU") at Pelican Bay State Prison, had not proved that she was subjected to a hostile work environment because of inmate sexual misconduct. (Doc. 890.) The jury further found that Plaintiff had not proved that Defendant David Skerik personally participated in discriminating against her based on her gender or set in motion a series of acts by others which he knew or reasonably should have known would cause others to discriminate against her based on her gender. *Id*. Now pending before the court is Plaintiff's Motion for a New Trial. Doc. 907. Defendants oppose the motion. Doc. 917. For the reasons discussed below, the court denies Plaintiff's Motion for a New Trial.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 59(a)(1), a court "may, on motion, grant a new trial on all or some of the issues." After a jury trial, a court may grant a new trial, "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed.R.Civ.P. 59(a)(1)(A). A court may grant a new trial "if the verdict is contrary to the clear weight of the

1  evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."
2  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation marks omitted).
3  A judge should not grant a new trial unless "left with the definite and firm conviction that a
4  mistake has been committed." *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1372
5  (9th Cir. 1987) (internal quotation marks omitted).  In considering a Rule 59(a) motion for a new
6  trial, the court "is not required to view the trial evidence in the light most favorable to the verdict.
7  Instead, the district court can weigh the evidence and assess the credibility of the witnesses."
8  *Experience Hendrix LLC v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014).

## DISCUSSION

### Weight of the Evidence

The first question on the verdict form was, "Did Plaintiff Martha Berndt prove, by a preponderance of the evidence, that she was subject to a sexually hostile work environment because of inmate sexual misconduct?" Doc. 890.  The jury answered "no" to this question. *Id*  Plaintiff contends that this outcome is against the weight of the evidence presented at trial, arguing that the evidence showed that Berndt was subjected to a hostile work environment.

> A plaintiff asserting a Title VII claim under a hostile work environment theory must show (1) the existence of a hostile work environment to which the plaintiff was subjected, and (2) that the employer is liable for the harassment that caused the hostile environment to exist. *See Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 966 (9th Cir. 2002) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787–89, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). To establish the existence of a hostile work environment, "a plaintiff must prove that (1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) this conduct was sufficiently severe or pervasive to alter the conditions of ... employment and create an abusive working environment." *Id*. (internal quotations omitted). The third element requires us to consider the totality of the circumstances and whether the harassment was both objectively and subjectively abusive. *Id.*

*Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006).

Plaintiff contends that the "the only possible evidentiary basis in the record" for the jury's negative answer to question number 1 on the verdict form was the testimony of Defendants' prison expert witness, Dr. Steve Martin.  Doc. 907, 9:10-11.  She also contends that the court erred in admitting that testimony.  Plaintiff references the following testimony by Dr. Martin.

2

Dr. Martin was asked:

> Now, in your review of materials for the 1997 to 2002 time period at Pelican Bay, did you form any opinion about whether inmate indecent exposure was a severe or pervasive problem at Pelican Bay?

Doc 881, 1082:11-14. Over the objection of Plaintiff's Counsel, Dr. Martin was allowed to answer:

> I would not characterize it in terms -- relatively speaking, in terms of management of an institution as either serious and certainly not pervasive in terms of sheer incidents as compared to inmate assaults and staff assaults and uses of force that occur. All of those are serious events that typically involve -- can involve physical harm to parties. So with the frequency that those occur in Pelican Bay, those other, what I consider to be, physical harm, immediate physical harm incidents, you compare inmate exposure to those numbers, and it's not -- I don't know how to say, other than I calculated a percentage of -- well, I'll just -- the OIG report I understand is in evidence. They took events at Pelican Bay over a seven-month period, I believe in January to July, 2000, and calculated all the events. You know, disciplinary infractions and force that you have in prison. And inmate exposure cases were three percent. Three percent of that. As opposed to over -- I think I calculated 77 cases as opposed to over a thousand -- over a thousand assaults, both inmate on inmate, inmate on staff, applications of force and threats to assault. That, my friend, is a pervasive problem.

Doc 881, 1083:9-1084:3. Dr. Martin further testified:

> Relative to an inmate exposure, inmate locked securely behind his cell, no imminent bodily threat, exposed himself, while it's demeaning, it's vulgar, no question about that, it's not something pleasant, it's not what we're talking about in terms of serious, threatening management issues that get people hurt and killed. It simply is not.

Doc 881, 1087:22-1088:3.

In arguing initially that this testimony should not have been admitted, Plaintiff complains that, "it shows a lack of understanding of the legal issues in a Title VII sexual harassment/hostile working environment case." Doc. 907, 15:5-6. This argument is nonsensical, as Dr. Martin did not purport to have such an understanding or to state an opinion on those legal issues. To the contrary, Dr. Martin expressly testified that he had no expertise in the area of equal employment opportunity issues, and had never been involved as an expert in a case involving gender discrimination. Doc. 881, 1104:3-13. Plaintiff had a variety of methods available at trial to

3

explain her view of Dr. Martin's testimony to the jury, and it was up to her to do so.

Plaintiff's claim that the "only possible evidentiary basis" the jury could have relied on to find against her was the testimony of CDCR' s prison expert, Steve Martin, that sexual misconduct was less pervasive than physical violence at Pelican Bay, ignores the actual question before the jury. That is, whether inmate sexual misconduct was "sufficiently severe or pervasive to alter the conditions of employment." *Freitag*, 468 F.3d at 539.

The record supports the conclusion that any correctional officer job, and especially a Pelican Bay SHU Correctional officer job, requires working with difficult-to-manage inmates who frequently violate institutional rules. Plaintiff's witness, Dr. Roy Curry, testified that, from his personal experience, "[inmates] are usually anti-authority and they get pleasure out of manipulating others, if they can. Themselves as well as those who have power over them." Doc. 895, 147:17-19. Dr. Curry testified that Plaintiff told him that most inmates were manipulative because "that's all they had. They had time to think about how to provoke the guards or others." *Id.* at 13-14. When asked whether all inmates housed in the SHU were "difficult-to-manage" inmates, union representative Rick Newton responded "absolutely." Doc. 894, 85:2. Former Officer Hastings testified that, along with sexual misconduct, inmates insulted her, called her names, threatened her safety, threatened to kill her, and tried to intimidate her. Doc. 894, 161:2-11. Plaintiff's own prison expert, Ken Katsaris, described the work environment in prison as "probably underappreciated by the majority of citizens who have no idea of how difficult it is to work there to start with." Doc. 896, 826:11-12. When asked whether "maintaining order in a prison is enhanced by isolating the most chronic troublemakers from the general population," Katsaris responded "that's what the Supermax prisons are for." Doc. 896, 852:23-853:2. Katsaris agreed that staff working in a SHU unit must be "uniquely adaptable to working in an abnormal setting with persons who present inordinate adjustment and management problems." Doc. 896, 854:15-17. Dr. Martin testified that Pelican Bay is different than other prisons in California because it is a "very, very high security facility," designed to house "very difficult-to manage prisoners, prisoners that are violent, prisoners that are persistent in their institutional misconduct." Doc. 881, 17:15; 17:24-18-1. Joe McGrath, the former warden, testified that Pelican Bay was

4

1   built as the "most secure prison that California has and houses probably the most difficult to

2   manage and dangerous inmates in the State of California." Doc. 881, 187:21-23. McGrath

3   described in detail the types of difficult inmates that employees at Pelican Bay were tasked with

4   controlling: violent inmates, volatile inmates, and those with a "history of making poor decisions

5   [who] are not well suited to listen and take direction from staff and do what they're told to do."

6   Doc. 881, 189:8-22.

7       Additionally, Dr. Martin testified that inmate indecent exposure is something that a prison

8   must address, and that a prison cannot ignore it. Doc. 888, 33:15-20. The prison experts from

9   both sides agreed that inmate masturbation offenses were impossible to completely stop. Doc.

10  881, 33:21-22; Doc. 896, 840: 2-7. Martin explained to the jury that prisons have "chronic

11  offenders" and that no matter what sanctions are imposed, "[i]f they have the opportunity to act

12  out, they will." Doc. 881, 35:20-21. Warden McGrath testified that there were two inmates,

13  chronic offenders, responsible for approximately half of the indecent exposure incidents at Pelican

14  Bay: Snaggletooth Johnson and Goldwire Jackson. Doc. 881, 35:20-21.

15      The jury was required to review the totality of the circumstances in assessing the work

16  environment at Pelican Bay and in determining whether inmate sexual misconduct Plaintiff

17  encountered was sufficiently severe or pervasive to alter her work environment. *See, Freitag*, 468

18  F.3d at 541. In addition, the finding of an abusive work environment requires a showing that the

19  conduct was both objectively and subjectively abusive. *Id*. As Plaintiff argues, the Ninth Circuit

20  has held that a single incident of severe abuse can constitute a hostile work environment. *Id*. at

21  540. This, however, does not absolve the jury from analyzing whether both Plaintiff and an

22  objective person would find her work environment was unlawfully altered by her specific

23  experience. Plaintiff's work environment happened to be the "end of the line" for difficult inmates

24  in California, including at least two inmates who constantly engaged in sexual misconduct.

25  Additionally, the work environment at Pelican Bay was physically violent. The jury heard

26  Warden McGrath summarize the range of inmate misconduct as everything from murder to

27  thievery, drugs, and assault on other inmates and staff. Doc. 881, 1250:14-20.

28      In light of all the evidence presented to the jury, the undersigned concludes that Plaintiff

has not established that the jury's determination on this issue was against the clear weight of the evidence.[1]

**Admission of Testimony under Rule 704**

Plaintiff contends that the court violated Rule 704 of the Federal Rules of Evidence by admitting the testimony of Dr. Martin set forth above. She argues that the testimony told the jury what outcome to reach as to whether Plaintiff was subjected to verbal or physical conduct that was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. Rule 704, however, provides in relevant part as follows: "[a]n opinion is not objectionable just because it embraces an ultimate issue." The court did not sustain an objection to Dr. Martin's testimony on the ground that it reached an ultimate issue in the case.

Plaintiff cites the Advisory Committee Notes to the 1972 Proposed Rules regarding Rule 704, which provide in part:

> The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day.

The testimony cited by Plaintiff, Martin's opinion that inmate sexual misconduct was less pervasive than violent misconduct at Pelican Bay, was permissible. Martin was qualified as a prison management expert, the testimony was relevant and reliable, and could assist the trier of fact in determining whether CDCR was devoting adequate resources and attention to combatting the problem of inmate sexual misconduct. Fed. R. Evid. 702 and 704.

Plaintiff is incorrect that Martin's opinion was an improper legal conclusion. Martin, in the lengthy citation included in Plaintiff's motion, opined that indecent exposure was not as pervasive as violent crime at Pelican Bay, relying on data he reviewed. This is a factual conclusion, not a legal one. Plaintiff's prison expert, Katsaris, used the term "pervasive" six times when testifying to describe the problem of inmate sexual misconduct at Pelican Bay. Doc. 896, 799:3, 802:14,

---

[1] In light of this conclusion, the court finds it unnecessary to address Plaintiff's arguments regarding the weight of the evidence to support the other elements of a sexual hostile work environment claim.

6

816:14, 817:11, 817:20, 870:25. Martin was permitted to rebut Katsaris' characterization of the problem as "pervasive." Martin's testimony did not address the specific issue of whether the conduct Plaintiff Berndt was subjected to was sufficiently severe or pervasive to alter her work environment. His testimony compared the relative pervasiveness of sexual misconduct to the violence at Pelican Bay.

When Defense Counsel posed a question specific to Plaintiff's work experience, the court sustained Plaintiff's objection. The court sustained Plaintiff's objections to questions that would actually have gone to ultimate fact, *i.e.*, whether four incidents over eighteen months would constitute a severe or pervasive hostile work environment. Doc. 881, 1095:21-1096:6. The court further sustained an objection to a question, based on the same Rule 704 objection, about whether a "reasonable female correctional officer [would] have to expect some sort of indecent exposure conduct." Doc. 881, 1096:8-13. The court later reviewed and affirmed these rulings. Doc. 881, 1116:23-1117:15.

The court properly admitted Martin's factual opinions that fell within his expertise and that were supported by the evidence in the record. No violation of Rule 704 occurred.

**Limitation of Testimony to Period of May 24, 1997 to July 13, 2002**

In ruling on Defendants' Motion for Summary Judgment as to Plaintiff Berndt, Chief Judge Hamilton found that the continuing violation doctrine applied in this case. Doc. 739, 7:12-19. Chief Judge Hamilton ruled that this doctrine allowed "the inclusion of otherwise time-barred incidents as long as they are deemed part of 'one unlawful employment practice giving rise to a single claim,'" quoting *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 118 (2002). *Id.* at 15-18. The court therefore determined that it would consider all four inmate exhibitionist masturbation ("IEX") incidents alleged by Plaintiff to be part of her Title VII claim, regardless of whether they occurred outside the 300 day limitation period before Plaintiff administratively exhausted her claims. Doc. 739, 7:18-19.

At the Final Pretrial Conference held on August 17, 2015, Chief Judge Hamilton acknowledged her prior ruling regarding the continuing violation doctrine. Transcript of Final Pretrial Conference, 7:20-24; 12:6-7. Stating that she had not yet set the exact parameters of the

time period for which evidence would be admitted, Chief Judge Hamilton ruled that the end date would be the last day of Plaintiff's employment. *Id.* at 12:14-16.  Chief Judge Hamilton then asked Plaintiff's Counsel what date she would prefer as a starting date.  Counsel proposed the date of May 24, 1997, which the court accepted, and memorialized in the Final Pretrial Order. *Id.* at 13:8, 21-25; Doc. 821, 2:12-14.  Judge Hamilton applied the same time period limitation to evidence of harassment experienced by third parties.  Doc. 821, 2: 25-27.

Plaintiff now contends that the court erred in limiting the time frame so as to begin on May 24, 1997.  Plaintiff argues evidence of inmate masturbation during the entire time Plaintiff worked at Pelican Bay was relevant, and that the time period should therefore have begun in 1994.  The only specific prejudice claimed by Plaintiff is that evidence could have been admitted of seven 115s filed by Officer Marla Aguirre regarding incidents in April through May 9 of 1997.

The authority cited by Plaintiff establishes only that a court may exercise its discretion to consider evidence showing a hostile work environment over an entire employment period; it does not make such consideration mandatory.  *See Morgan*, 536 U.S. at 118 ("Provided that an action contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.")  Further, Plaintiff's argument that, "'[i]f Attorney Price had been given the opportunity to do so, she would have proposed a longer time since under the Morgan  decision she could have requested the entire time of Officer Berndt's employment," proceeds from a false premise.  The beginning date of May 24, 1997, was imposed by the court only after it was suggested by Plaintiff's Counsel.  Counsel could have proposed an earlier date.  She could, for example, have proposed a date that would have included all of April and May 1997.  There is nothing in the record to suggest that the court would have rejected such a date.[2]  Plaintiff cannot now be heard to complain of the imposition of a

---

[2] Chief Judge Hamilton asked a very open question, stating as follows:
What I'd like to know from you is what is the start date? It's impossible to tell, given all of the documents you've submitted, including the charts that are the subject of another motion. I mean, these things go back for years. And I'm not -- I'm not entirely persuaded that all of them should go -- that I'm going to permit all of that evidence. So you tell me, what is it you are seeking in terms of a time frame for these two plaintiffs? Complaints commencing when and ending when they leave the employment.

1  date limitation she herself offered.  Any claim of error has been waived.

2  **Limitation of Number of Documented Instances of Exhibitionist Masturbation Admitted**

3  During the cross-examination of Defendants' expert witness Dr. Martin, Plaintiff sought to admit documents relating to ten 115s by other female correctional officers involving Goldwire Jackson between December, 2001, and June, 2002.  The court excluded this evidence.  Doc. 880, 100-103; Doc. 881, 71, 74, 83; Doc. 894, 60-62.  The court found specifically that,"[g]iven the findings that are in the Freitag decision, the Court believes that its ruling in regards to the number of 115s for other incidents not related specifically to Ms. Berndt is more than adequate for the plaintiff to show a pervasiveness."  Doc. 895, 593:14-18.  Plaintiff now argues that "the jury could have taken a far different view of the question of the pervasiveness of inmate exhibitionist masturbation as well as the validity of Dr. Martin's opinion as to pervasiveness and severity if it had these exhibits before it."  Doc. 907, 23:9-12.

In so arguing, Plaintiff ignores the extent of the evidence the court admitted to support the issue of pervasiveness.  The court admitted the OIG report (Exhibit 1 ), Plaintiff's IEX charts (Exhibits 2-3), and numerous other IEX reports by other correctional officers (Exhibits 6, 7, 9, 11, 13-17, 20, 25, 28-32, 41, A-C).  These documents provide a clear picture of the total number of IEX incidents that occurred during Plaintiff's employment at Pelican Bay.  Plaintiff has made no showing how any of the information in the excluded documents would have changed the overall picture presented to the jury.  Further, the opinion of Plaintiff's prison expert, Ken Katsaris, relied on the total number of IEX incidents to support his opinion on the issue of pervasiveness.  Katsaris discussed the full extent of inmate Jackson's misconduct, the total number of reported IEX incidents at Pelican Bay, and the incidents' effect on women correctional officers.  Doc. 896, 794:19-800:4, 816:14-818:15, 821:1-4, 825:4-22, 828:15-18, 835:18-20, 838:18-839:3, 862:12-863:14.  He stated specifically that he reviewed over one hundred 115s from the relevant time period, all of which involved sexual conduct by inmates.  Doc. 896, 56:8-19.  Contrary to Plaintiff's assertion of prejudicial deprivation, the jury had ample evidence on the issue of

---

Transcript of Final Pretrial Conference, 12:17-25

pervasiveness to consider in reaching its verdict.

**Judicial Notice of Rulings in *Freitag***

During the trial, Plaintiff requested that the Court take judicial notice of two rulings. Docs. 879, 872. The first was the ruling that this case and *Freitag v. CDCR,* 3:00-cv-02278 TEH, were related cases pursuant to Civil L.R. 3-12, because "[t]he cases involve substantially the same events and questions of fact and law, to wit: whether the inmates at Pelican Bay State Prison created a sexually hostile work environment to which the defendants failed to appropriately respond, and whether the defendants unlawfully retaliated against female employees who voiced concerns about the inmates' conduct." Doc. 5, 2:1-4. The second was the Order Granting Permanent Injunction, entered by Judge Henderson on August 18, 2003, in *Freitag*. Doc. 872-1 That injunction, in part, permanently enjoined the California Department of Corrections "from engaging in any employment practices, or taking any other personnel action, for the purpose or with the effect of maintaining a sexually hostile work environment at Pelican Bay State Prison." Doc. 872-1, 8:18-19. Plaintiff argues that Judge Henderson's order was directly relevant to and probative of key issues in this case, *i.e*., whether there was a hostile working environment at Pelican Bay and whether CDCR had taken reasonable steps to remedy the situation.

The court denied Plaintiff's request for judicial notice, finding the evidence more prejudicial than probative. Doc. 880, 15-17. As was repeatedly reiterated by the court during the trial, Plaintiff had the burden of convincing the jury that she, not Officer Freitag, was subjected to a hostile working environment. Judge Henderson's legal conclusions regarding the working environment at Pelican Bay were based on evidence presented at a completely separate trial. The unfair prejudice deriving from the introduction of Judge Henderson's legal conclusions in this case would have greatly outweighed any probative value. *See* Rule 403, Federal Rules of Evidence. To have allowed the jury to consider those conclusions would have created a high risk of confusing the issues and misleading the jury. *Id*. The court did not err by denying Plaintiff's requests for judicial notice.

//

//

**Testimony of Captain Patten**

Plaintiff contends that the court erred in admitting certain testimony of Captain Cara Patten, because the testimony was not properly disclosed and was prejudicial. Based on a recollection that occurred during the trial, Patten testified that she was the supervisor responsible for inmate Jackson not being moved on July 12, 2002. Doc. 897, 1416:25-1417:7. She also testified about her personal knowledge of IEX with male correctional officers. Plaintiff provides no legal authority to support her contention that admission of this testimony was erroneous.

Defendants timely disclosed Patten as a trial witness on the issues of her work history; Martha and Allan Berndt; the CDCR; Pelican Bay State Prison and inmates; the job duties of correctional officers and correctional supervisory and management personnel and related training; referral of inmate crimes to the District Attorney; and inmate Goldwire Jackson. Doc. 864, 2:14-19. Plaintiff did not object to the scope of Patten's proposed testimony at either pretrial conference, thus any challenge on this ground is waived. Further, Plaintiff took Patten's deposition in 2013, and thus had ample opportunity to discover the scope of Patten's possible testimony. Plaintiff also had the opportunity during discovery to inquire into Patten's personal knowledge regarding Plaintiff's claims by taking Patten's supervisors' depositions or by propounding specific interrogatories.

Plaintiff claims that she was prejudiced by Patten's testimony because Plaintiff had been held to a more rigorous standard as to disclosure of her witnesses. She relies specifically on the court's ruling excluding Officer Freitag from testifying at trial because Plaintiff failed to timely include Officer Freitag on her witness list. Doc. 865, 5:18-6:19. Plaintiff argues that by contrast, Captain Patten was allowed to testify to matters "wholly undisclosed and as to which Plaintiff had no opportunity to rebut or otherwise challenge." Doc. 907, 25:23-24.

Plaintiff's argument is meritless. The exclusion of Freitag's testimony did not somehow make the admission of Patten's testimony improperly prejudicial to Plaintiff. Moreover, the exclusion of Officer Freitag was wholly attributable to Plaintiff's Counsel's failure to comply with the requirements of this court's pretrial court. Captain Patten, however, was on Defendants' witness list and her work history was disclosed as a topic on which she would testify.

11

"The district court has broad discretion to admit potentially prejudicial evidence under Rule 403." *United States v. Rizk*, 660 F.3d 1125, 1132 (9th Cir.2011). Patten was present at trial during testimony relating to Plaintiff's claim that Defendants ignored her request to immediately move inmate Jackson on July 12, 2002. While listening to this testimony, Patten remembered that she was involved in the decision not to move inmate Jackson on that night. Doc. 897,1394:2-6; 1420:12-15. Defendants are not required to disclose impeachment or unknown information prior to trial. Fed. R. Civ. P. 26(a)(3), (e)(l)(A). Patten's testimony on this issue was not known prior to trial and was used solely for impeachment purposes. The court's decision to admit this testimony was within its discretion.

**Putative Misconduct by Defense Counsel**

Plaintiff contends that during the course of the trial there were a number of acts of "misconduct" by Defense Counsel that "could have affected the jury's verdict." Plaintiff provides no citation to a legal standard governing claims of attorney misconduct as a basis for a motion for a new trial.

> A new trial should only be granted where the "'flavor of misconduct ... sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.'" *Kehr v. Smith Barney*, 736 F.2d 1283, 1286 (9th Cir. 1984) (quoting *Standard Oil Co. of California v. Perkins*, 347 F.2d 379, 388 (9th Cir. 1965)). There is an even "high[er] threshold" for granting a new trial where, as here, defendants failed to object to the alleged misconduct during trial. *Kaiser Steel Corp. v. Frank Coluccio Constr. Co.*, 785 F.2d 656, 658 (9th Cir. 1986). A higher threshold is necessary for two reasons: "First, raising an objection after the closing argument and before the jury begins deliberations 'permit[s] the judge to examine the alleged prejudice and to admonish ... counsel or issue a curative instruction, if warranted.' " *Hemmings v. Tidyman's Inc*., 285 F.3d 1174, 1193 (9th Cir. 2002) (quoting *Kaiser*, 785 F.2d at 658). Second, "allowing a party to wait to raise the error until after the negative verdict encourages that party to sit silent in the face of claimed error." *Id*.

*Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 516-17 (9th Cir. 2004)

The first alleged misconduct is that Defense Counsel asserted in opening statement that IEX was reported by men, but Defendants failed to produce any actual IEX reports by men. Overpromising on the evidence during opening statement is not misconduct. There are many reasons why counsel may change her mind during the course of trial as to what evidence she will introduce. Plaintiff, of course, had the option of pointing out the absence of the promised

1   evidence in closing argument.  The court notes that Plaintiff's own evidence, Exhibit 1, the OIG
2   Report, showed that IEX was reported by men.  Katsaris testified that the OIG Report noted
3   seventeen reports by male staff members of indecent exposure and/or masturbation.  Doc. 896,
4   123:12-14.  Defendants also produced Exhibit P, Warden McGrath's response to the OIG Report,
5   and testimony by Martin and Patten which directly addressed this issue.

6   The second alleged misconduct is Defendants' failure to produce evidence regarding
7   Correctional Officer Hunt's disability retirement after questioning Plaintiff about it during cross-
8   examination.  Overpromising evidence after a sustained objection during cross-examination is not
9   misconduct.  Again, Plaintiff could have noted the absence of the promised evidence in closing
10  argument.

11  The third alleged misconduct is Defense Counsel's statement in closing argument that
12  Plaintiff filed "only" four IEX reports.  This statement is not misconduct because it accurately
13  summarizes the evidence.  Exhibits 21, 22, G, J.  Moreover, Defense Counsel's argument that the
14  low number of 115s filed by Plaintiff against Jackson showed that there was no hostile work
15  environment was just that: argument.  It was not, as Plaintiff now contends, a misstatement of the
16  law.  Plaintiff's counsel was free to argue, as she does now, that under controlling law, the severity
17  of sexual misconduct did not depend on the number of incidents.

18  The fourth alleged misconduct is Defense Counsel's question during cross-examination
19  regarding Plaintiff's rental income.  The court sustained Plaintiff's objection to this line of inquiry
20  as irrelevant and admonished the jury to disregard it.  Plaintiff has failed to show how asking this
21  question amounted to misconduct or was prejudicial.

22  The fifth alleged misconduct is Defense Counsel's questioning during cross-examination
23  regarding Plaintiff's trips and related interaction with Warden McGrath.  Plaintiff and her husband
24  both testified that Plaintiff was catatonic for four months following inmate Jackson's IEX on July
25  2002.  Plaintiff's Counsel also implied that the Berndts had no access to Warden McGrath because
26  of the "chain of command" at Pelican Bay, a fact that McGrath himself rebutted during his
27  testimony.  Defendants were allowed to elicit impeachment testimony to contradict Plaintiff's
28  claims.  While this impeachment of Plaintiff's testimony may have been prejudicial, it was not

1 misconduct.

2 The sixth alleged misconduct was Defense Counsel's impeachment of Alan Berndt relating
3 to testimony he gave under oath during his industrial injury litigation. It is not improper to
4 impeach a witness based on previous testimony in unrelated litigation.

5 The seventh alleged misconduct was Defense Counsel's questions regarding defense expert
6 fees. On cross examination, Plaintiff asked Dr. McNiel about his fees. Doc. 881, 1184:3-21. On
7 redirect, Defendants attempted to establish that Dr. McNiel did not get to keep any of those fees,
8 but that he was required to give all fees earned to his employer, UCSF. Doc. 881, 1197:17-
9 1198:114. Plaintiff objected that it was "irrelevant what [Dr. McNiel] does with his money," and
10 the court sustained the objection. Doc. 881, 1198:2-4. Defense Counsel attempted to revisit this
11 topic later by asking another question of Dr. Binder. The court sustained Plaintiff's Counsel's
12 objection. Doc. 881, 1236:4-12. Plaintiff has failed to show how this tangential issue had any
13 effect on the issues to be determined by the jury. Further, the Court cured any possible negative
14 effect by forcefully instructing the jury that it was to disregard it. *United States v. Washington*, 26
15 462 F.3d 1124, 1136 (9th Cir. 2006) (Judge's prompt corrective action in response to counsel's
16 improper comments is sufficient to cure any problems arising from the comments.).

17 The eighth alleged misconduct involves the testimony by Captain Patten discussed above.
18 The court finds no misconduct on the part of Defense Counsel.

19 In conclusion, the court finds that Plaintiff's allegations of misconduct by Defense Counsel
20 provide no basis for a new trial.

21 **Counsels' Participation in Voir Dire**

22 Plaintiff contends that the limitations placed on Counsels' participation in voir dire by the
23 court prevented a full and adequate evaluation of the prospective jurors. Plaintiff argues that the
24 ability of counsel to participate in voir dire was limited in two ways. First, counsel was not
25 furnished with either a proposed questionnaire or the questions the court would ask the
26 prospective jurors. Second, counsel were limited to fifteen minutes to ask questions of the
27 eighteen prospective jurors.

28 Plaintiff supports her contentions by citing to best-practice recommendations adopted by

1    the Judicial Council of the Ninth Circuit in 2006. These recommendations include the use of case-
2    specific, focused questionnaires "where the jurors' personal experiences might have a significant
3    impact on their ability to be fair, such as those involving sexual assault." The court's decision not
4    to adopt this recommendation falls well within its inherent discretion in the content and conduct of
5    voir dire of prospective jurors in civil cases. Fed.R. Civ.P. Rule 47(a). Further, the court asked all
6    prospective jurors whether they, their close friends or relatives, had been the subject of harassment
7    in the workplace or a hostile work environment. The court allowed jurors to answer that question
8    in camera, wherein Plaintiff had unlimited time for questioning.

9    Plaintiff is mistaken in stating that counsel were not provided with the questions that the
10   court would ask of the prospective jurors. At the Pretrial Conference on January 14, 2015, the
11   court explained exactly what questions it would ask. Doc. 861, 18:10-19:22.

12   Judge Hamilton's and Judge Vadas's Standing Pretrial Orders expressly state that the court
13   will conduct voir dire and counsel will be allowed a "brief period for follow-up questions." This
14   is standard practice in the Northern District. Plaintiff did not object to limiting the questioning to
15   fifteen minutes during the final pretrial hearings on August 17, 2015 and January 14, 2016. Doc.
16   821; 865; 861, 4, 6-20. Plaintiff further failed to object to the fifteen-minute limitation at trial,
17   either prior to or during voir dire. Plaintiff now fails to provide any offer of proof of follow-up
18   questions she was unable to ask the jury panel, stating only that "changes in the manner in which
19   the voir dire was conducted could have resulted in fuller information being obtained from the
20   prospective jurors." Doc. 921, 11:2-3. Such speculation is insufficient to show either an abuse of
21   discretion or legal error, <u>particularly in light of the fact that Plaintiff's Counsel did not use her
22   entire allotted fifteen minutes</u>.

23   In summary, the court finds no merit in Plaintiff's argument the limitations placed on
24   Counsels' participation in voir dire prevented a full and adequate evaluation of the prospective
25   jurors. The court finds no basis for a new trial.

26   //
27   //
28   //

**CONCLUSION**

A judge should not grant a new trial unless "left with the definite and firm conviction that a mistake has been committed." *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d at 1372. After considering all of Plaintiff's arguments and reviewing the record, the undersigned has a definite and firm conviction that no mistake was committed. Accordingly, Plaintiff's Motion for a New Trial is HEREBY DENIED.

**IT IS SO ORDERED**.

Dated:   May 19, 2016     _____
NANDOR J. VADAS
United States Magistrate Judge